IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

**ROSALIE A. BOWERS**,

     Plaintiff,

     v.

**MICHAEL J. ASTRUE**,
**Commissioner of Social Security,**

     Defendant.

Case No. 6:11-cv-583-SI

**OPINION AND ORDER**

Sara L. Gabin
4500 S.W. Kruse Way, Suite 100
Lake Oswego, Oregon 97035
     Attorney for Plaintiff

Amanda Marshall
United States Attorney
Adrian L. Brown
Assistant United States Attorney
U.S. Attorney's Office
District of Oregon
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204

Jordan D. Goddard
Special Assistant United States Attorney
Social Security Administration
Office of General Counsel
701 Fifth Avenue, Suite 2900
M/S 221A
Seattle, Washington 98104
     Attorneys for Defendant

Opinion and Order, Page 1

SIMON, District Judge.

# I.   INTRODUCTION

This is an action to obtain judicial review of a final decision by the Commissioner of the Social Security Administration ("Commissioner") denying the application of Rosalie Bowers for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income benefits ("SSI"). Plaintiff alleges disability since March 24, 2008, on the basis of dependent personality disorder, panic attacks, depression, cognitive and memory impairments, and musculoskeletal impairments including mild degenerative disk disease, kyphosis, scoliosis, and flat feet. Her date last insured for purposes of DIB is December 31, 2011.[1] Because the ALJ erred at steps four and five of the sequential analysis and because the Appeals Council did not consider post-hearing evidence offered by the Plaintiff, the court reverses the Commissioner's decision and remands for further administrative proceedings to enable the ALJ to consider the post-hearing evidence and reconsider his determinations at steps four and five.

# II.   BACKGROUND

Plaintiff filed an application for benefits on January 31, 2008. Her claims were denied initially and upon reconsideration. A hearing was held before Administrative Law Judge ("ALJ") Riley J. Atkins. On March 18, 2010, the ALJ issued a decision finding Plaintiff not disabled. After the Appeals Council denied review on April 13, 2011, the ALJ's decision became the final

---

[1] DIB benefits require at least 20 quarters of coverage within the 40-quarter period that ends with the quarter in which the disability occurred.  The end of a claimant's insured status is frequently referred to as the "date last insured."  In a DIB case, the claimant must prove that the current disability began on or before the date last insured.  *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1998).  Proving disability before the date last insured is not necessary for receipt of SSI benefits.

decision of the Commissioner.

Plaintiff was born in 1957 and was 53 years old at the time of the ALJ's decision. She was graduated from high school and attended college but did not complete a degree. Her past relevant work is as a file clerk and data entry/medical billing clerk. Her employment ended when she was laid off as part of a reduction in force.

**A.    Medical Evidence**

On June 11, 2008, Plaintiff was given an intellectual assessment by Cheryl Brischetto, Ph.D. Tr. 170-80. Plaintiff's mother reported to Dr. Brischetto that she had been told Plaintiff had brain damage, but that there was no formal diagnosis and Plaintiff took no special education classes. Plaintiff never repeated a grade and said she had graduated from high school with passing grades and attended community college for approximately two years. Tr. 171.

Plaintiff reported depression, especially since losing the job Plaintiff described as her "lifeline." Tr. 172. She was having difficulty sleeping and got nervous more easily. *Id.* She was forgetful at times and added that when she was under any type of pressure or stress, such as when taking a typing test, she became panicky. *Id.*

Dr. Brischetto observed that Plaintiff's expressive language was clear and coherent. Tr. 173. On general ability testing, her overall full scale IQ score was between low average and average. Tr. 175. She indicated some weakness on attention-based measures relative to her IQ summary scores. She was able to follow a single step command but was slow (although correct) in responding to a two step command. She seemed slow to complete paperwork. She performed in the average range on a reading recognition task, but in the borderline range on a spelling task. Tr. 175. She did well on tasks of verbal reasoning, except for some mild weakness on tasks of

common sense, reasoning and judgment. Dr. Brischetto emphasized that her examination was "only an intellectual assessment and not a neuropsychological screening," and suggested other testing to obtain information about memory functioning and cognition. *Id.* Dr. Brischetto wrote, "Without more background information and only a limited intellectual assessment this examiner would speculate that there is likely some learning disability present and a Learning Disorder Not Otherwise Specified ("NOS") is noted." Tr. 176. Dr. Brischetto's diagnoses were Provisional Learning Disorder NOS, Provisional Dysthymia, Adjustment Disorder with Depressed Mood, and dependent personality features. Tr. 177.

On June 30, 2008, psychologist Arthur Lewy, Ph.D. determined, after reviewing her medical records, that Plaintiff had Adjustment Disorder with Depressed Mood with dependent personality features. Tr. 181-88. In his opinion, Plaintiff had moderate limitations in the ability to: (1) understand, remember, and carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) interact appropriately with the general public; (4) respond appropriately to changes in the work setting; and (5) set realistic goals or make plans independently of others. Tr. 195-96.

On September 12, 2008, Plaintiff saw her primary care physician, Cynthia Talbot, for an annual gynecological examination. Tr. 201. Plaintiff told Dr. Talbot she had been laid off in March and had not been able to find a job she could do, adding that she "tends to get very nervous and has 'panic attacks' and hands shake when she has to take typing tests." *Id.* Dr. Talbot observed that Plaintiff was dependent on her mother for "all direction," and that she could follow directions from her mother, but it was "very hard for her to initiate or problem solve." *Id.*

On May 2, 2009, Plaintiff was seen by Danielle Eigner, D.O., for complaints of

depression and anxiety. Tr. 298. Plaintiff was brought in by her mother. Plaintiff reported anxiety, palpitations, insomnia, racing thoughts, and depressed mood. *Id.* Dr. Eigner wrote that Plaintiff's mother "believes she needs disability and would like approval for disability," and reported that Plaintiff's symptoms of depression and anxiety "have been getting particularly worse since losing job about four [sic] years ago."[2] *Id.* Plaintiff said when she was employed, she "was able to have a structure to her days and that was calming." *Id.*

On April 1, 2009, Paul Rethinger, Ph.D., assessed Plaintiff's mental functional capacity based on his review of her medical records. Tr. 210-28. His diagnoses were, like Dr. Lewy's, Adjustment Disorder and dependent personality features, and he opined that Plaintiff had moderate impairments in the ability to: (1) in maintain concentration, persistence, or pace; (2) understand, remember, and carry out detailed instructions; (3) interact appropriately with the general public; and (4) set realistic goals or make plans independently of others. *Id.*

On June 16, 2009, Dr. Eigner wrote that Plaintiff's mother was "focused on having her daughter qualify for SSI or disability." Tr. 289. Plaintiff's mother reported that Plaintiff was "very insecure and dependent on" her. *Id.* Plaintiff reported that she considered herself disabled by anxiety and panic. *Id.*

Dr. Eigner referred Plaintiff to Joshua Boverman, M.D., for a psychiatric consultation. Tr. 279. Dr. Boverman wrote that Plaintiff was "fairly housebound currently by anxiety symptoms," and that she described "classic panic attacks when she leaves the house and particularly stressful situations." Tr. 280. Plaintiff denied suicidal thoughts and reported that she enjoyed some activities and was "often in a good mood" since starting Zoloft. *Id.* Mental status

---

[2] Plaintiff was laid off from her job in March 2008, approximately one year earlier.

examination revealed that Plaintiff was in no acute distress; speech and motor activities were within normal limits, her mood was "fine," and her affect was "benign and of normal range." Tr. 281. Thought process was concrete and thought content showed no homididal or suicidal thoughts. Judgment and insight were intact. *Id.* Dr. Boverman diagnosed Panic Disorder with Agoraphobia and Dependent Personality Features. Tr. 280.

Plaintiff began treatment with Matthew Judge, M.D. on July 23, 2009. Tr. 264. Plaintiff reported that since losing her job, she had lost self esteem, cried frequently and easily, slept poorly, had racing negative thoughts about herself, and lacked interest in activities she had previously enjoyed. *Id.* She also described episodes of sweating, trembling, and yelling during stressful situations, such as taking typing tests or trying to file her taxes online. *Id.* Dr. Judge wrote that Plaintiff had been started on sertraline [Zoloft] approximately six weeks earlier, and that Plaintiff thought her mood had improved, as she was no longer crying as easily, laughing more, and sleeping better. Tr. 265. Her one panic attack during the time she had been on sertraline was "much less severe." *Id.* Dr. Judge diagnosed "mild to moderate" depression, anxiety, and social phobia with dependent traits. Tr. 268.

On August 13, 2009, Dr. Judge wrote that Plaintiff's mood was slightly improved with sertraline, but that she continued to have "significant poor self image, limiting socially and functionally." Tr. 262. On September 6, 2009, Plaintiff reported being able to tolerate typing exercises without having panic attacks. Tr. 257. She was tolerating sertraline well. Tr. 258. On September 10, 2008, Dr. Judge wrote that Plaintiff reported "slightly improved motivation with tasks and sleep." Tr. 254. Plaintiff was working on "trying to come up with solutions more on her own and not rely on her mother as often or at least not turn to her immediately for help." *Id.*

Opinion and Order, Page 6

On October 8, 2009, however, Plaintiff reported worsening generalized anxiety, as finances were "severely limited" for herself and her mother. Tr. 251. Plaintiff also alluded to, but was hesitant to discuss, her mother's declining health and worries about the future. *Id.*

On October 22, 2009, Dr. Judge wrote that "much of the session was spent discussing Ms. Bowers's anxiety in social situations, her reluctance to engage people due to poor self image." Tr. 248. Plaintiff reported feeling "flatlined," and emotionally withdrawn. *Id.* Dr. Judge revised his diagnoses to Generalized Anxiety Disorder and Panic Disorder with Agoraphobia. *Id.*

On November 5, 2009, Plaintiff reported being "able to go to the pharmacy by herself, with some reluctance, and being surprised that the trip went off without an issue." Tr. 244-45. Plaintiff agreed to try to limit her time in front of the computer and get out of the house more often, with the specific tasks of going to church, taking walks, and "possibly going to a musical at her library." Tr. 245. On December 3, 2009, Plaintiff was "quite happy," explaining that she and her mother had devised an idea to save on Christmas gifts. Tr. 241. Dr. Judge wrote, "She was quite enthusiastic about problem solving on her own. She has also made several trips out of her home since our last visit," including attending church, going to the grocery store and library by herself, and speaking briefly on the phone with a friend. *Id.* Plaintiff agreed to an increased sertraline dosage of 200 mg, stating that "a friend is on the same medication and felt to be doing well on it." *Id.*

On January 21, 2010, Plaintiff told Dr. Judge she had enjoyed Christmas and her birthday, but that her mood was nevertheless "up and down" due to increasing concerns about losing her mother and her limited ability to cope alone. Tr. 237. After some discussion, she identified her church as a source of support, and acknowledged that she would likely be able to

function during her grief. *Id.* She had recently become discouraged over trying to learn Spanish and playing piano.  *Id.* She reported tolerating the increase in sertraline. *Id.*

On February 4, 2010, Dr. Judge noted that Plaintiff had continued going to the library twice a week for an hour to use the computers, a round trip of about one mile. Tr. 229. Dr. Judge thought her day sounded "largely unstructured." *Id.*

X-rays of Plaintiff's lumbosacral spine taken on February 4, 2010, showed dextroscoliosis of the lower thoracic and lumbar spine of approximately 23 degrees. Mild degenerative disease with disc space narrowing and spurring was seen in the thoracolumbar spine and mild facet arthropathy was seen over the lower lumbar spine. Tr. 235.

In response to a letter from Plaintiff's attorney dated October 4, 2010, James Daby, M.D. wrote that Plaintiff had the orthopedic impairments of scoliosis, kyphosis, and pes planus (flat feet), supported by clinical findings of decreased range of motion, lateral spinal curvature, and antalgic gait. Tr. 563. In Dr. Daby's opinion, the expected symptoms of these impairments were chronic low back pain, neck and shoulder pain, and bilateral foot pain after walking long distances. Tr. 564. Dr. Daby wrote that he had prescribed ibuprofen for these symptoms. *Id.* In Dr. Daby's opinion, Plaintiff could lift 20 pounds occasionally and 10 pounds frequently; stand or walk at least two hours in an eight-hour work day; and sit about six hours in an eight-hour work day. Tr. 565. Her gross and fine motor skills were within normal limits. *Id.*

**B.    Hearing Testimony**

Plaintiff testified that she worked as a file clerk for approximately 10-15 years, then did data entry and worked in the claims department, where she was able to alternate sitting and standing, because she wanted "some sit down work." Tr. 588-89, 593. When the claims

department went paperless, "that meant I had to be on my feet all day long and that's when I was starting to have physical problems." Tr. 593. When the company restructured, she was laid off, along with many other employees. Tr. 594. Plaintiff said she was afraid to apply for another job because her previous employers had not given her a bonus for two years and complained about her not doing things in a timely manner. Tr. 595. She was also afraid she was "going to fail the typing test like I always do." Tr. 596. Being under pressure to get things done at a certain time caused her to have anxiety and panic. Tr. 597.

Plaintiff said sertraline helped with her depression, but she was still anxious when answering the phone or leaving the house on her own. Tr. 598-99. She did, however, walk unaccompanied to the library almost every day, staying for about an hour, and to the grocery store. Tr. 599.

The ALJ called a vocational expert ("VE"), Paul Morrison. Tr. 606. The VE testified that Plaintiff's past work as a file clerk was classified as light work that was semiskilled. *Id.* Her past work doing medical billing and data entry were classified as sedentary, semiskilled work. Tr. 607. The ALJ asked the VE to consider a hypothetical claimant capable of medium level work, unskilled or low semiskilled, with only brief, occasional public contact. *Id.* The VE testified that the hypothetical individual could do the work of a file clerk. *Id.* The ALJ modified the hypothetical to include standing or walking no more than two to four hours during the workday, still at the medium level. Tr. 608. The VE testified that with the change, the individual could no longer do the job of a file clerk because "that person needs to be up and about approximately six hours in the workday." *Id.* The ALJ then asked the VE to consider other jobs that could be done by an individual with Plaintiff's education and work experience. *Id.* The VE asked, "Are we

back to your original hypothetical or are we back to–" and the ALJ responded, "[W]hy don't we

go with the second[?]" The ALJ asked, "Still at medium?" and the ALJ answered, "Yes."

The VE testified that two possible jobs were the medium jobs of hardware assembler and

recycler/reclaimer. *Id.* The ALJ then asked whether there were also light level jobs the

hypothetical individual could do, and the VE responded with two jobs in the light category:

small products assembler and paper sorter recycler. Tr. 609.

## C.    The Sequential Evaluation

The Commissioner has established a five-step sequential process for determining whether

a person is disabled. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520,

416.920. At step one, the Commissioner determines whether the claimant is engaging in any

substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, the Commissioner

proceeds to step two, to determine whether the claimant has a "medically severe impairment or

combination of impairments." *Yuckert,* 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c),

416.920(c). That determination is governed by the "severity regulation," which provides:

> If you do not have any impairment or combination of impairments
> which significantly limits your physical or mental ability to do
> basic work activities, we will find that you do not have a severe
> impairment and are, therefore, not disabled. We will not consider
> your age, education, and work experience.

§§ 404.1520(c), 416.920(c). If the impairment is severe, the evaluation proceeds to the third step,

where the Commissioner determines whether the impairment meets or equals "one of a number

of listed impairments that the [Commissioner] acknowledges are so severe as to preclude

substantial gainful activity." *Yuckert,* 482 U.S. at 140-41. If a claimant's impairment meets or

equals one or more of the listed impairments, the claimant is considered disabled without

consideration of age, education or work experience. 20 C.F.R. §§ 404.1520(d), 416.920(d).

If the impairment is considered severe, but does not meet or equal a listed impairment, the Commissioner considers, at step four, whether the claimant can still perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant shows an inability to perform past work, the burden shifts to the Commissioner to show, in step five, that the claimant has the residual functional capacity ("RFC") to do other work in consideration of the claimant's age, education and past work experience. *Yuckert*, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(f), 416.920(f).

**D.      The ALJ's Decision**

At step two, the ALJ found that Plaintiff had the following severe impairments: Generalized Anxiety Disorder, Panic Disorder, and Adjustment Disorder with Mixed Mood. The ALJ noted that lumbosacral x-rays taken on February 4, 2010, revealed mild degenerative disc disease and scoliosis on the right measuring 22 degrees. The ALJ found, however, that Plaintiff's medical records did not reveal "any significant complaint of back pain or limitation caused by these conditions," indicating that they did not impose significant restrictions on her ability to perform work-related activities. Tr. 23.

The ALJ found that Plaintiff had only mild to moderate impairment in activities of daily living ("ADLs"), and moderate impairments in social functioning and concentration, persistence, or pace. He concluded that her mental impairments did not meet or medically equal a listed impairment. Tr. 24. The ALJ found that Plaintiff had the RFC to perform medium work that was unskilled or "low semi-skilled" and that involved brief, occasional contact with the public. Tr. 25.

Opinion and Order, Page 11

The ALJ discredited Plaintiff's testimony that difficulty standing and walking, along with anxiety and panic attacks, prevented her from working, because the testimony was inconsistent with Plaintiff's reported ADLs, including: (1) being able to attend to her own personal needs without assistance from others; (2) being consistently well groomed; (3) performing household chores, such as cleaning, laundry and ironing; (4) walking to the grocery store and bringing groceries back home; (5) walking seven blocks to the library almost daily and using the computers there; (6) having no difficulty sitting; (7) being able to play computer games; (8) not always requiring someone to accompany her; (9) using public transportation; (10) attending church and singing in the choir, including performing solos; and (11) reading, watching television, playing piano, crocheting, and doing word puzzles. Tr. 24. The ALJ noted that Plaintiff "stopped working for reasons unrelated to an alleged impairment" and that earnings records showed steady full-time employment between 1986 and 2008. Tr. 26. The ALJ also noted Plaintiff's testimony that she had taken the bus to work every day and that she was laid off with many others as part of a corporate restructuring. Tr. 27. The ALJ found no evidence to indicate "a significant deterioration" of Plaintiff's medical condition since the layoff, from which he inferred that Plaintiff's alleged impairments did not prevent her from working adequately at the time of the layoff, despite similar medical conditions. *Id.*

In arriving at Plaintiff's RFC, the ALJ gave "great weight" to the observations of Dr. Brischetto that Plaintiff's expressive language was clear and coherent and that during testing she was alert, fully oriented, able to attend and focus without distractability, and could process at a rate commensurate with her full scale IQ score of 87. Tr. 27. The ALJ found unpersuasive Dr. Talbot's opinion that Plaintiff could only work in a sheltered workshop situation because of an

organic brain syndrome secondary to the childhood anoxic brain injury. The ALJ noted Dr.

Talbot's failure to find any abnormality in her examination of Plaintiff, the fact that Dr. Talbot's

opinion was based entirely on the reports of Plaintiff and her mother, and Plaintiff's ability to

engage in unsheltered work subsequent to the childhood brain injury for a period of over  20

years.  *Id.* The ALJ found no indication in Dr. Talbot's report that Plaintiff's condition had

undergone a significant deterioration since her layoff six months earlier. Tr. 28.

The ALJ found that Dr. Judge's most recent notes indicated improved mood and sleep

and fewer panic attacks from a combination of psychotherapy and medication, including

lorazepam and sertraline. *Id.* The ALJ found that Dr. Judge's most recent record of February 4,

2010, showed a diagnosis of generalized anxiety disorder and panic disorder with agoraphobia;

the ALJ gave these findings great weight except for the diagnosis of agoraphobia, which the ALJ

found contradicted by the evidence of Plaintiff's frequent outings from home and use of public

transportation. *Id.*

At step four, the ALJ found that Plaintiff was able to return to her past relevant work as a

file clerk. *Id.* Alternatively, at step five, the ALJ found, based on the testimony of the VE, that

Plaintiff was capable of performing the jobs of hardware assembler, recycler/reclaimer, small

products assembler, and paper sorter/recycler. Tr. 29.

### III.    STANDARD OF REVIEW

The Court must affirm the Commissioner's decision if it is based on proper legal

standards and the findings are supported by substantial evidence in the record.  *Meanel v. Apfel*,

172 F.3d 1111, 1113 (9th Cir. 1999). In determining whether the Commissioner's findings are

supported by substantial evidence, the Court must review the administrative record as a whole,

weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The Commissioner's decision must be upheld even if "the evidence is susceptible to more than one rational interpretation." *Andrews v. Shalala,* 53 F.3d 1035, 1039-40 (9th Cir. 1995).

The initial burden of proving disability rests on the claimant. *Meanel*, 172 F.3d at 1113. To meet this burden, the claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). This means an impairment must be medically determinable before it is considered disabling.

## IV.    DISCUSSION

### A.    Claimed Error at Step Two

Plaintiff asserts that the ALJ erred at step two of the sequential analysis by concluding that her flat feet, kyphosis, scoliosis, and dependent personality disorder were not severe impairments. The step two inquiry is a *de minimis* screening device to dispose of groundless claims. *Bowen v. Yuckert,* 482 U.S. 137, 153-54 (1987) (step two inquiry intended to identify claimants whose medical impairments are so slight that it is unlikely they would be found disabled); *Webb v. Barnhart,* 433 F.3d 683, 686 (9th Cir. 2005) (step two impairment "may be found not severe *only if* the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work") (emphasis in original). A finding at step two

that impairments are severe only raises a prima facie case of a disability. *Hoopai v. Astrue*, 499

F.3d 1071, 1076 (9th Cir. 2007).

A claimant's impairment or combination of impairments is not severe if it does not

significantly limit his or her physical or mental ability to do basic work activities, which include:

(1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, standing,

carrying or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding,

carrying out, and remembering simple instructions; (4) use of judgment; (5) responding

appropriately to supervision, co-workers and usual work situations; and (6) dealing with changes

in a routine work setting. 20 C.F.R. §§ 404.1521, 416.921.  An impairment or combination of

impairments can be found "not severe" only if the evidence establishes a slight abnormality that

has "no more than a minimal effect on an individual's ability to work." *See* SSR 85-28, 1985

WL 56856 *3 (S.S.A.). To move beyond step two, the claimant must provide medical evidence

of the impairment. 20 C.F.R. § 404.1508.

Dr. Daby diagnosed Plaintiff with flat feet, kyphosis, and scoliosis. Tr. 563. In Dr.

Daby's opinion, these conditions could cause "bilateral foot pain after walking long distances,"

chronic low back pain, and neck and shoulder pain. Tr. 564. Although Plaintiff stated that her

feet hurt "if I'm on my feet for 15 minutes," Dr. Daby opined that Plaintiff could stand or walk at

least two hours in an eight hour workday and sit about six hours in an eight hour workday. Tr.

565. Dr. Daby's opinion does not suggest that flat feet, kyphosis, and scoliosis have more than a

minimal effect on Plaintiff's ability to walk, stand, and sit, particularly in view of Plaintiff's

previous ability to work despite these longstanding impairments. The court finds no error at step

two.

Dr. Brischetto diagnosed Plaintiff with an Adjustment Disorder with Depressed Mood and Dependent Personality features. Tr. 177.  Reviewing psychologist Dr. Lewy concurred with Dr. Brischetto's diagnoses. Tr. 184, 188. Dr. Boverman diagnosed Panic Disorder with Agoraphobia and Dependent Personality Features. Tr. 280. Dr. Judge initially diagnosed Depression or Adjustment Disorder with Depressed Mood and Anxiety and dependent traits, Tr. 268, but subsequently revised his diagnoses to Generalized Anxiety Disorder and Panic Disorder with Agoraphobia. Tr. 248. The ALJ found that Plaintiff had the following severe impairments: Generalized Anxiety Disorder, Panic Disorder, and Adjustment Disorder with Mixed Mood. There is no specific diagnosis of Dependent Personality Disorder in the medical record. Accordingly, I find no error in the ALJ's decision not to include Dependent Personality Disorder as a severe impairment, in addition to the three mental impairments that the ALJ did find to be severe.

**B.    Credibility findings**

Unless there is affirmative evidence showing that the claimant is malingering, the Commissioner's reasons for rejecting the claimant's subjective testimony must be clear and convincing. *Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005). General findings are insufficient; the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints. *Berry v. Astrue,* 622 F.3d 1228, 1234 (9th Cir. 2010). The evidence upon which the ALJ relies must be substantial. *Holohan v. Massinari*, 246 F.3d 1195, 1208 (9th Cir. 2001). Clear and convincing reasons include conflicting medical evidence, effective medical treatment, medical noncompliance, inconsistencies in the claimant's testimony or between her testimony and her conduct,  daily activities inconsistent with the alleged symptoms, and

testimony from physicians and third parties about the nature, severity and effect of the symptoms complained of. *Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (9th Cir. 2008); *Lingenfelter v. Astrue*, 504 F.3d 1028, 1040 (9th Cir. 2007); *Light v. Social Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).

Plaintiff challenges the ALJ's finding that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." She argues that this is the circular reasoning rejected by this court, as well as being based on erroneous RFC findings. The court agrees with both arguments.

Because the ALJ's RFC assessment is not evidence, much less substantial evidence, a credibility finding based on the ALJ's RFC assessment is clearly erroneous. *See, e.g., Meanel*, 172 F.3d at 1113 (Commissioner's findings must be supported by substantial evidence in the record). This court has held in several cases that rejecting a claimant's credibility based upon the conclusions reached in the ALJ's RFC assessment is error because such an analysis

> reverses the manner in which an ALJ considers a claimant's credibility. The ALJ must consider a claimant's symptom testimony in construing the claimant's RFC assessment. 20 C.F.R. § 416.945(a)(3); SSR 96-8p at *7 (available at 1996 WL 374184). Dismissing a claimant's credibility because it is inconsistent with a conclusion that must itself address the claimant's credibility is circular reasoning and is not sustained by this court.

*Leitheiser v. Astrue,* No. 10-6243-SI, 2012 WL 967647 *9-10 (D. Or. Mar. 16, 2012), *quoting Lowe v. Astrue,* No. 10-0904-MO, 2011 WL 4345168 *1 (D. Or. Sept. 15, 2011), *citing Carlson v. Astrue,* 682 F. Supp.2d 1156, 1167 (D. Or. 2010); *Cohoon v. Astrue,* 2011 WL 3841568 at *5 (D. Or. Aug. 30, 2011); *Young v. Astrue,* 2010 WL 331781 at *5 (D. Or. Jan. 21, 2010).

In addition, as discussed below, the ALJ's RFC finding, that Plaintiff was capable of

Opinion and Order, Page 17

medium level work, is without evidentiary support in the record. The court's finding of error in these respects does not, however, mean that the ALJ's credibility findings are not based on other substantial evidence in the record. *See Batson v. Comm'r,* 359 F.3d 1190, 1197 (9th Cir. 2004) (although one credibility finding was erroneous, substantial evidence remained to support the ALJ's conclusions on credibility).

The ALJ also made credibility findings based on Plaintiff's ADLs and on the fact that she had been laid off from her previous job. If a claimant is able to spend a substantial part of her day engaged in pursuits involving the performance of physical functions that are transferable to a work setting, a specific finding as to this fact may be sufficient to discredit a claimant's allegations, *Morgan v. Comm'r,* 169 F.3d 595, 600 (9th Cir. 1999), but the ALJ must make "specific findings relating to the daily activities" and their transferability to conclude that a claimant's daily activities warrant an adverse credibility determination." *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007)*. See also Stubbs-Danielson v. Astrue,* 539 F.3d 1169, 1175 (9th Cir. 2008) (claimant's ability to engage in "normal activities of daily living, including cooking, house cleaning, doing laundry, and helping her husband in managing finances" suggested that she was capable of performing basic demands of competitive, remunerative, unskilled work on a sustained basis"); *Burch,* 400 F.3d at 680-81 (claimant's daily activities of caring for her own personal needs, cooking, cleaning, shopping, and interacting with family suggests claimant was "quite functional"); *Curry v. Sullivan,* 925 F.2d 1125, 1130 (9th Cir. 1990) (claimant's ability to take care of personal needs, prepare meals, do light housework, and shop for groceries "may be seen as inconsistent with the presence of a condition which would preclude all work activity").

Plaintiff asserts that the ALJ erred in finding her not credible based on her ADLs because

it is "apparent" from the record that "Bowers performs these activities in settings where she feels sheltered." Pl. Brief, p. 14. She argues that the ALJ has not cited evidence showing that she can perform her daily activities outside her home or "carefully selected surroundings." *Id.*

The court finds Plaintiff's argument unpersuasive. The evidence cited by the ALJ indicates that Plaintiff is able to leave her home to attend church and sing in the choir, walk to the library and the grocery store, and do her own grocery shopping. While the places may be familiar and comfortable, they are not necessarily sheltered settings, any more than public transportation. The activities cited by the ALJ are substantial evidence supporting an inference that Plaintiff has the ability to engage in such work-related activities as reading, using computers, maintaining her personal appearance, interacting with other people in public, traveling to and from a workplace, and managing financial transactions.

Plaintiff also challenges the ALJ's finding that there was no evidence in the record showing that Plaintiff was unable to interact independently or appropriately with others or in groups, arguing that this finding was "at odds with Bowers' constant fear of what others think, and her difficulty initiating such basic activities as leaving home and talking on the phone," as well as evidence, submitted after the hearing, showing that Plaintiff had difficulty initiating communication, tended to panic in a rush assignment, adapted poorly to change, and needed extra time to carry out her daily functions. Plaintiff argues that this post-hearing evidence should have been considered by the Appeals Council, and that the court should consider it here, citing *Taylor v. Commissioner,* 659 F.3d 1228 (9th Cir. 2011) and 20 C.F.R. § 404.970(b) ("If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing

decision.") Where the Appeals Council was required to consider additional evidence, but failed to do so, remand to the ALJ is appropriate so that the ALJ can reconsider his or her decision in light of the additional evidence. *Taylor*, 659 F.3d at 1233. Accordingly, the court concludes that remand for further administrative proceedings is required so that the ALJ can evaluate this post-hearing evidence.

Plaintiff also argues that the ALJ was "required to consider fully the portions of the medical record" that were "consistent with Bowers' testimony." The evidence included: (1) Dr. Talbot's concern about what would happen to Plaintiff when her mother died and her opinion that Plaintiff required a sheltered work environment; (2) Dr. Eigner's referring Plaintiff to a psychiatrist for her mental symptoms; and (3) Dr. Judge's decision to focus Plaintiff's therapy on learning to solve problems independently, not fear the opinions of others, increase solo outings and daily responsibilities, talk on the phone, and structure a normal day. The court finds no error here. In interpreting the evidence, the ALJ is not required to discuss every piece of evidence. The ALJ need not discuss all evidence presented, but must explain why significant probative evidence has been rejected. *Stark*, 886 F. Supp. at 735. *See also Howard ex rel. Wolff v. Barnhart*, 341 F.3d 1006, 1012 (9th Cir. 2003) (in interpreting the evidence and developing the record, the ALJ need not discuss every piece of evidence).

Plaintiff challenges the ALJ's reliance on *Bruton v. Massanari,* 268 F.3d 824, 833 (9th Cir. 2001) for the adverse credibility finding based on the fact that Plaintiff lost her job because she was laid off, and not because she was disabled. In *Bruton,* the court found that the claimant's statement that he had left his job because he was laid off, rather than because of disability, was one of three sufficient reasons for disregarding the claimant's pain testimony. Plaintiff argues

that there is evidence in the record she had been unable to adapt to changes in the workplace before being laid off. The court finds Plaintiff's argument unpersuasive in the absence of any evidence presented to the ALJ that her job ended for any reason other than being laid off. As previously discussed, however, the case will be remanded to enable the ALJ to consider Plaintiff's post-hearing evidence.

## C.    Reliance on Dr. Brischetto's Report

Plaintiff asserts that the ALJ erred by accepting Dr. Brischetto's report because the report was incomplete in two respects: (1) it did not address Plaintiff's physical limitations resulting from flat feet and thoracic scoliosis, and (2) it did not assess Plaintiff's ability to perform basic work activities. The court is unpersuaded. As a psychologist doing an intellectual assessment, Dr. Brischetto was neither called upon nor competent to address Plaintiff's physical limitations. Dr. Brischetto recorded Plaintiff's mother's statements that Plaintiff had had an extremely high fever as an infant, had a lifelong history of problems with flat feet, hypertension, a crooked spine, pain in her hip and shoulder, a "thyroid problem" and anemia. Tr. 171-72.

Plaintiff is mistaken that Dr. Brischetto's evaluation did not assess her ability to perform basic work activities. Her report shows that Dr. Brischetto administered psychological tests that measured the skills necessary to meet the mental demands of employment: intelligence, academic achievement, memory, and depression. The court finds no error here. Dr. Brischetto properly made no findings about Plaintiff's ability to perform basic work activities, since her role was limited to an intellectual assessment.

## D.    Failure to recontact Dr. Judge

Plaintiff asserts that the ALJ erred by failing to contact Dr. Judge to develop the record in

view of a 10-13 point drop in Plaintiff's IQ between 1979 (tr. 174, 341) and Dr. Brischetto's

findings in June 2008, and to address Dr. Judge's findings that Plaintiff would have difficulty

maintaining attendance at work, sustaining concentration, receiving criticism, and working

independently, thereby contradicting Dr. Brischetto's findings.

The ALJ's duty to develop the record is triggered "only when there is ambiguous

evidence or when the record is inadequate to allow for proper evaluation of the evidence."

*Mayes v. Massanari*, 276 F.3d 453, 460 (9th Cir. 2001). The court is unpersuaded that a

discrepancy between IQ scores in 1979 and those in 2008 triggers a duty to develop the record.

The ALJ is not required to discuss every piece of evidence, particularly evidence that is quite

remote in time.  *See, e.g., Howard v. Barnhart,* 341 F.3d 1006, 1012 (9th Cir. 2003) (in

interpreting the evidence and developing the record, the ALJ does not need to discuss every

piece of evidence). Despite different numerical scores (on different versions of the Wechsler

Adult Intelligence Scale), both Dr. Wiens in 1979 and Dr. Brischetto in 2008 concluded that

Plaintiff had normal cognitive functioning and average intelligence; the discrepancy is therefore

not probative on the question of disability. Tr. 341, 174.

The court finds no error in the ALJ's failure to re-contact Dr. Judge for further

development of his post-hearing opinions. As discussed above, the proper procedure is for the

court to remand this case for further proceedings to enable the ALJ to consider Dr. Judge's post-

hearing report. *See Taylor,* 659 F.3d at 1233.

E.    **RFC Findings**

Plaintiff argues that the ALJ erred by finding her able to work at a medium exertion level[3] without citing any evidence to support this finding. Plaintiff argues that according to Dr. Daby's opinion, Plaintiff could lift only 20 pounds occasionally, and 10 pounds frequently, limitations below the level of medium exertion.

The record contains no evidence–much less substantial evidence–that Plaintiff is able to work at the medium level of exertion, and the ALJ erred in so finding. The court concludes that this error was not harmless.

Unless a reviewing court can confidently conclude that no reasonable ALJ would have reached the same conclusion without the error, an error is not harmless. *Stout v. Comm'r*, 454 F.3d 1050, 1056 (9th Cir. 2006). The ALJ's first hypothetical to the ALJ would put this case squarely within the holding of *Matthews v. Shalala,* 10 F.3d 678, 681 (9th Cir. 1993). In that case, the court held harmless the ALJ's error in excluding from the VE's consideration a hypothetical including a limitation on remaining in one position because the ALJ had found that the claimant could return to his previous work, which required a combination of sitting and standing. Consequently, the VE's testimony was "useful, but not required," because the plaintiff's ability to perform his past relevant work meant the burden of proof did not shift to the

---

[3]Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  20 C.F.R. §§ 404.1567(a), 416.967(a). Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  20 C.F.R. §§ 404.1567(b), 416.967(b). Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  20 C.F.R. §§ 404.1567 (c), 414.967(c). Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.  20 C.F.R. §§ 404.1567(d), 416.967(d). Very heavy work involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more.  20 C.F.R. §§ 404.1567(e), 416.967(e).

Commissioner at step five of the sequential analysis.

Had the VE's testimony been based on the ALJ's first hypothetical, the ALJ's finding that Plaintiff was capable of medium work would have been harmless in light of a finding that Plaintiff could return to her previous work as a file clerk, a light job. The ALJ's *second* hypothetical to the VE, however, was based not only on the erroneous assumption of medium level work, but also on the additional limitation of being unable to "not stand or walk more than two to four hours during the work day." Tr. 608. This hypothetical appears to have been based on Dr. Daby's opinion that Plaintiff could stand or walk at least two, but less than six, hours in an eight hour work day. *See* tr. 565. The VE testified that the two to four hour limitation on standing or walking *ruled out* the job of file clerk because "that person needs to be up and about approximately six hours in the workday." *Id.* Tr. 608. The ALJ then asked the VE to apply the second hypothetical, "still at medium," and consider whether there were other jobs Plaintiff could do. Tr. 608. The VE opined that such an individual could do two medium level jobs, but could also do the light jobs of small products assembler and paper sorter recycler. Tr. 609.

In his decision, the ALJ concluded at step four that Plaintiff could return to her past work as a file clerk (a finding inconsistent with his second hypothetical) and that she could also, at step five, perform the jobs of hardware assembler and recycler/reclaimer (both based on the unsupported finding that Plaintiff could do medium level work) as well as perform the jobs of small products assembler and paper sorter/recycler, both light level jobs. Thus, although the ALJ identified five different jobs he found Plaintiff capable of doing, only the two jobs of small products assembler and paper sorter/recycler are consistent with the evidence in the record.

In light of this record, the court is unable confidently to conclude that no reasonable ALJ

would have reached the same conclusion without the ALJ's errors. Further administrative proceedings, therefore, are required to determine Plaintiff's RFC.

## V.    CONCLUSION

This action is reversed and remanded for further administrative proceedings, to enable the ALJ to consider the post-hearing evidence not considered by the Appeals Council and to determine Plaintiff's RFC and reconsider steps four and five of the sequential analysis.

IT IS SO ORDERED.

DATED this 25th day of June, 2012.

 /s/ Michael H. Simon

Michael H. Simon
United States District Judge